IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| FEDERAL INSURANCE COMPANY, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>EDWARD T. JOYCE FIRM, P.C. )<br>)<br>Defendant. ) | No. 1:08-cv-00431<br><br>Judge William T. Hart |

## RESPONSE TO FEDERAL'S MOTION
## FOR EXPEDITED PRODUCTION

### I.      BACKGROUND FACTS

#### A.     The Formation of EPS

EPS Solutions Corp. (hereafter, "EPS") was formed in 1998 through the consolidation of over 30 private companies in a transaction known as a "roll-up." Through the roll-up, the private companies' owners and employees acquired EPS securities in the hope that EPS would be successful and would engage in an initial public offering ("IPO").  By mid 2000, however, EPS was a complete failure and its securities were worthless.

#### B.     EPS's D&O Coverage

In connection with its formation, EPS purchased $10 million of primary insurance from National Union against certain liabilities for itself and its directors and officers (the "National Union Primary Policy").  EPS also purchased $15 million of excess D&O coverage from Federal (the "Federal Excess Policy").[1]  The Federal Excess Policy

---

[1]      EPS also purchased additional layers of excess D&O coverage from other insurers, but those excess policies are not germane to this discovery dispute.

1

"follows form" to the National Union Primary Policy, such that both policies expressly extend to "Securities Claims."

### C. The Early Securities Claims Brought Against EPS And Others.

Beginning in late 2000, some of the roll-up participants who suffered investment losses when EPS's securities became worthless filed securities claims against EPS, Deloitte & Touche ("Deloitte") and Jefferies & Co. ("Jefferies"). One of those claimants was James Holden, whose claim shall hereafter be referred to as the "*Holden* claim."[2] The gist of these claims (like the *Holden* claim) was that the promoters of the rollup had failed to disclose certain material facts regarding the roll-up.

EPS's defense to these claims was that it had not failed to disclose any material facts, and that the blame for any alleged non-disclosures rested with Deloitte and Jefferies. Indeed, EPS sued Deloitte and Jefferies in this district court, alleging that those companies were responsible for the failure of the roll-up. Thus, EPS's defense strategy in the securities claims (like the *Holden* claim) was consistent with its offensive strategy in its affirmative case--i.e., that EPS was a victim of wrongful conduct by Deloitte and Jefferies.

### D. The Securities Claims Brought By Clients of the Joyce Firm.

By the spring of 2002, there were still over 100 EPS shareholders who had not yet filed claims to recover their investment losses. At that time, over 100 of those EPS shareholders retained Edward T. Joyce & Associates (the "Joyce firm") to pursue their claims. Initially, the Joyce firm was going to follow Holden's lead and bring claims against Deloitte, Jefferies and EPS. Instead, however, the Joyce firm agreed to a proposal

---

[2] The *Holden* claim and every other claim thereafter filed against EPS, Deloitte and Jefferies was sent to arbitration because of an arbitration clause contained in the roll-up transaction documents.

2

from EPS's counsel (the "Bollinger firm") to refrain from suing EPS and instead work together against their common enemies, Deloitte and Jefferies. The gist of the proposal was that (a) by working with EPS against those common enemies, the Joyce firm's clients (hereafter, the "*Arias* and *Lee* claimants") might be able to recover all of their investment losses from Deloitte and Jefferies, (b) if so, there would never be any need to sue EPS, (c) but if the claims against Deloitte and/or Jefferies were unsuccessful, the *Arias* and *Lee* claimants could then bring claims against EPS, and (d) if those claims against EPS became necessary, EPS could raise any defense other than the passage of time during the standstill agreement.

With the standstill agreement in place, the Joyce firm worked with the Bollinger firm from spring 2002 to spring 2004 to develop evidence against Deloitte and Jefferies. Along the way--in January 2004--Jefferies settled the claims brought against it by EPS, *Holden* and the *Lee* and *Arias* claimants. Deloitte did not settle with anyone. Throughout this period, National Union was well aware of EPS's defense strategy, and National Union exhausted its coverage defending EPS. By January 2004, Federal was paying EPS's defense costs for the *Holden* claim (and the other claims EPS had been unable to hold off with a standstill agreement). EPS's defense strategy did not change when the Federal Excess Policy kicked-in.

### E. Federal Sues EPS But Then Pays The EPS Settlement With The Holdens.

On February 5, 2004, Federal filed a lawsuit against EPS in this district court seeking a judicial declaration of its rights and obligations under the Federal Excess Policy. The gist of Federal's claim was that EPS had no right to coverage for the *Holden* case because EPS and its counsel had instigated and/or assisted that case. EPS's

3

procedural response was to move that case into arbitration pursuant to EPS's contract rights. EPS's response on the merits was to (a) deny that it had instigated any claims against EPS, (b) explain that it had been attempting (with limited success) to convince roll-up claimants to first pursue Deloitte and Jefferies (in exchange for a standstill agreement), and (c) emphasize that its only cooperation with the Holdens (and any other claimants) was in developing evidence that would place responsibility for their investment losses on Deloitte and Jefferies. As explained in more detail later, despite the fact that Federal's claim has been pending since February 2004, Federal did not seek any documents from the Joyce firm until December 2007.

While the *Federal v. EPS* claim was pending, the hearing on the *Holden* claim against Deloitte and EPS was set to begin on June 18, 2004. In early June 2004, EPS had an opportunity to settle its exposure on the *Holden* claim for $6.5 million. Instead of disclaiming coverage, Federal paid the $6.5 million settlement. The Holdens then proceeded with their claim against Deloitte and lost that claim pursuant to an award issued by the AAA arbitration panel on October 26, 2004.

### F. The Joyce Firm's Clients Fulfill Their Agreement To Seek Recovery Of Their Investment Losses From Deloitte.

When the Holdens lost their claim against Deloitte, the Joyce firm's clients (i.e., the *Arias* and *Lee* claimants) could see with 20/20 hindsight that their agreement to take a standstill from EPS was not working out the way they had hoped. Nevertheless, the Joyce firm's clients fulfilled their agreement with EPS and continued their efforts to recover the balance of their investment losses from Deloitte.[3]

---

[3] As previously stated, the *Arias* and *Lee* claimants had made a partial recovery through their settlements with Jefferies.

4

From November 2004 to March 2005, the *Arias* claimants completed their preparations for their arbitration hearing against Deloitte. Then from April to July 2005, they engaged in a 28 day hearing before a JAMS arbitration panel. On December 12, 2005, that panel ruled for Deloitte. At no time during this period did Federal request any documents from the Joyce firm or suggest in any way to the Joyce firm that EPS (or its counsel) had instigated litigation against EPS or assisted with claims brought against EPS. Any such suggestion would have been patently absurd.

### G.   After The Loss To Deloitte And Fulfillment Of The Standstill Agreement, The Joyce Firm's Clients Pursue EPS.

In January 2006--almost four years after their agreement to first pursue Deloitte and Jefferies--the *Lee* claimants filed their arbitration statement of claim against EPS. Between January and November 2006, the parties engaged in pre-hearing discovery, and the *Lee v. EPS* hearing was completed in December 2006. At no time during this period did Federal request any documents from the Joyce firm.[4]

On July 9, 2007, the arbitrator in *Lee v. EPS* entered an Interim Award, finding liability against EPS and awarding damages (before set-offs) of over $23 million. To that point in 2007, Federal still did not seek any documents from the Joyce firm even though Federal's arbitration claim against EPS was now over three years old.

On September 21, 2007, the arbitrator in *Lee v. EPS* entered a Final Award which reduced the Interim Award by over $7 million to credit EPS for prior settlements reached by the *Lee* claimants. Thus, the standstill agreement negotiated by EPS's counsel during 2002 had benefited Federal (and the other D&O carriers) in two ways. First, it had put off the day of reckoning for Federal's insured (EPS) for 5½ years. Second, by the time

---

[4]   Federal asserts in its motion that it was "precluded" from seeking documents from the Joyce firm during the *Lee v. EPS* arbitration, but Federal cites no such order to support its assertion.

5

EPS's day of reckoning finally arrived, EPS (and thus Federal) had less exposure because of settlements reached during the interim. Federal still made no request for any documents from the Joyce firm.

### H. Federal Refuses To Pay The Arbitration Award, So The Lee Claimants Sue Federal In San Francisco.

Federal refused to pay the arbitration award against its insured, EPS, so in late September 2007, the *Lee* claimants filed a lawsuit against Federal in San Francisco. By December 2007, Federal decided that it did not want to be litigating coverage issues in both Chicago (against EPS) and San Francisco (against the *Lee* claimants), so Federal filed a motion in the San Francisco case asking the judge to enter an order staying the Chicago arbitration. At the same time Federal was seeking support from the Joyce firm for its motion to stay the Chicago arbitration, Federal served the Joyce firm with a subpoena from the Chicago arbitration, demanding production in seven days of 23 very broad categories of documents going back to 2002.

The Joyce firm objected to the subpoena on several bases. First, we objected because the subpoena demanded production of documents in a case that Federal itself was seeking to stay. Second, we objected because, with very few exceptions, the requests are in no way tailored to the issues of whether EPS's counsel instigated litigation against EPS, or assisted with any claims against EPS. Third, we objected because Federal's delay (since 2004) in seeking these documents going back to 2002 had placed the Joyce firm in a situation whereby it would take many, many hours of searching through closed

6

files just to determine if there was anything responsive to the overly-broad requests--yet, Federal was not offering to pay for this burdensome search.[5]

Finally, we objected because (a) Federal knows (just as National Union knew) that between 2002 and 2004, EPS's counsel worked with the Joyce firm to develop evidence against Deloitte and Jefferies--not EPS; (b) Federal knows that such limited collaboration worked to its benefit when Jefferies settled with all claimants; (c) Federal knows that such limited collaboration was designed to further work to its benefit by placing the remaining responsibility on Deloitte; yet (d) Federal did not exclude from its requests the Joyce firm's privileged work product regarding the claims brought against Jefferies and Deloitte.

In reply to these objections, Federal made no attempt to narrow its requests or otherwise address the above listed legitimate concerns.

## II.    ARGUMENT REGARDING FEDERAL'S SUBPOENA

Request No. 1 seeks "All documents which relate to, reference or evidence expenses incurred in any of the Underlying Matters." The *Arias* case against Deloitte and Jefferies was one such "Underlying Matter." Thus, request No. 1 seeks the production of all the litigation expenses incurred by the Joyce firm's clients from 2002 through 2005 in a case that Federal's insured, EPS, was not even a party. It is clearly a fishing expedition.

Request No. 2 is not worth discussing because the Joyce firm has no responsive documents.

---

[5]   For example, if the Joyce firm searched through stacks of correspondence files, it might find one or more letters to or from EPS's counsel regarding strategy for deposing Deloitte's senior officers to establish liability against Deloitte. But at the completion of all this searching, there would be nothing probative of whether EPS's counsel assisted the Joyce firm with any claims against EPS (because there never was any such assistance).

7

Request No. 3 seeks "All documents which relate to or reflect any agreement with any person acting on behalf of EPS regarding the sharing of expenses incurred in the Underlying Matters or the Affirmative Case." Potentially, there might be a few documents responsive to this overly broad request, but they would not be relevant to Federal's claim against EPS. In that regard, when EPS's counsel and the Joyce firm traveled to New York to depose Deloitte's senior officers, or traveled to California to depose the investment bankers from Jefferies, they tried where possible to share expenses for this work against their common enemies. Such expense sharing benefited EPS's D&O carriers (including Federal), which is why National Union paid EPS's share of those expenses without claiming that there had been improper collaboration.

Request Nos. 4 - 6 are not worth discussing because the Joyce firm has no responsive documents.

Request No. 7 seeks "All documents sent to or received from EPS's counsel in any of the Underlying Matters relating to the investigation of the claims asserted in the Affirmative Case and the Underlying Matters;" Request No. 8 seeks "All documents that refer or relate to the preparation of the Complaint or any other pleading in the Affirmative Case;" and Request No. 9 seeks "All documents sent to or received from anyone acting on behalf of EPS that refer or relate to the preparation of the Complaint or any other pleadings in any of the Underlying Matters." As previously explained, a search of the voluminous closed files from the *Arias* case against Deloitte and Jefferies might turn up some work product documents discussing how to establish liability against those common enemies. However, such a search will not turn up any documents relevant to

8

Federal's claim against EPS, because EPS's counsel provided no assistance to any claim against EPS. (Again, EPS was not even a party in the *Arias* case.)

Request No. 10 is not worth discussing because the Joyce firm has no responsive documents.

Request No. 11 seeks "All documents sent to or received from EPS and/or Navigant Consulting Services or any of its agents or employees relating to the Underlying Matters or the Affirmative Case." As previously explained, a search of the voluminous closed files from the *Arias* case against Deloitte and Jefferies might turn up some documents about how to establish liability against those common enemies. However, such a search will not turn up any documents relevant to Federal's claim against EPS, because EPS's counsel provided no assistance to any claim against EPS.

Request No. 12 is not worth discussing because the Joyce firm has no responsive documents.

Request No. 13 and 14 seek "All documents which refer or relate to communications between EPS' attorneys and any lawyers for any party in the Underlying Matters and/or the Affirmative Case," and "All letters, notes, emails or memoranda sent to or received from anyone acting on behalf of EPS which refer or relate to the fraud alleged in the Affirmative Case." As previously explained, a search of the voluminous closed files from the *Arias* case against Deloitte and Jefferies might turn up some documents discussing how to establish liability against those common enemies. However, such a search will not turn up any documents relevant to Federal's claim against EPS, because EPS's counsel provided no assistance to any claim against EPS.

Request Nos. 15 and 16 are not worth discussing because the Joyce firm has no responsive documents.

Request Nos. 17, 18 and 19 seek "All documents which refer or relate to communications between you and any person acting on behalf of EPS in the Underlying Matters and/or the Affirmative Case," "All documents which refer or relate to meetings attended by you and any person acting on behalf of EPS in the Underlying Matters and/or the Affirmative Case," and "All documents provided to you by any person acting on behalf of EPS that in any way refer or relate to any deposition taken in the Underlying Matters or Affirmative Case." As previously explained, a search of the voluminous closed files from the *Arias* case against Deloitte and Jefferies might turn up some documents discussing how to establish liability against those common enemies. However, such a search will not turn up any documents relevant to Federal's claim against EPS, because EPS's counsel provided no assistance to any claim against EPS.

Request Nos. 20, 21 and 22 seek "All documents provided to you by any person acting on behalf of EPS that in any way refer or relate to strategy in the Underlying Matters or Affirmative Case," "All documents you provided to any person acting on behalf of EPS that in any way refer or relate to any deposition taken in the Underlying Matters or Affirmative Case," and "All documents you provided to by any person acting on behalf of EPS that in any way refer or relate to strategy in the Underlying Matters or Affirmative Case." If the Joyce firm made a search of its voluminous closed files from the *Arias* case, it might find some "strategy" documents regarding claims against Deloitte and Jefferies. Any such documents, however, would be privileged work product and

would be irrelevant to Federal's claims that EPS cooperated regarding claims against EPS.

Request No. 23 seeks "A copy of all indices, abstracts, summaries or any other memoranda relating to any deposition taken in the Underlying Matters or Affirmative Case that you sent to or received from EPS." This overly broad request again makes no effort to limit its scope to the issues in the *Federal v. EPS* arbitration.

In sum, requests 2, 4, 5, 6, 10, 12, 15 and 16 are moot because the Joyce firm has no responsive documents. Moreover, requests 1, 3, 7, 8, 9, 11, 13, 14, 17, 18, 19, 20, 21, 22 and 23 are overly broad because they are not tailored to the issues in the *Federal v. EPS* arbitration and are therefore irrelevant and unduly burdensome on the Joyce firm.

Respectfully submitted,

EDWARD T. JOYCE FIRM, P.C.,


By:    s/ Arthur W. Aufmann
       One of its attorneys.

Arthur W. Aufmann
Robert D. Carroll
EDWARD T. JOYCE & ASSOCIATES, P.C.
11 South LaSalle Street, Suite 1600
Chicago, Illinois 60603
(312) 641-2600

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that he caused a true and correct copy of the foregoing Response to Federal's Motion for Expedited Production to be served upon:

Janet R. Davis
Anne L. Blume
Meckler Bulger & Tilson
123 N. Wacker Drive
Suite 1800
Chicago, Illinois 60606

to be delivered via electronic mail delivery this 5th day of February, 2008.

s/ Arthur W. Aufmann